[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT. 26, 2001
THOMAS K. KAHN
CLERK

------------------------------------------

No. 99-12813

------------------------------------------

D. C. Docket No. 97-01421-CV-D-N

JOE MARSH, LEROY OWENS,

Plaintiffs-Appellants,

versus

BUTLER COUNTY, ALABAMA,
THE BUTLER COUNTY COMMISSION, et al.,

Defendants-Appellees.

------------------------------------------------------------------

Appeal from the United States District Court
for the Middle District of Alabama

------------------------------------------------------------------

**(September 26, 2001)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit Judges.

EDMONDSON, Circuit Judge:

This case is about Rule 12(b)(6) of the Federal Rules of Civil Procedure and the defense of qualified immunity.[1] We first decide whether Plaintiffs have sufficiently stated a claim against a County, its governing body, and its Sheriff for deliberate indifference to unsafe conditions at the county jail and for deliberate indifference to the serious medical needs of Plaintiff Owens following an assault. And if so, we then must decide whether the stated claims survive in the face of an asserted defense of qualified immunity. The district court dismissed the case altogether. We reverse the district court's order, except for the dismissal of certain claims alleged against the Sheriff and the dismissal of the claim against the County for deliberate indifference to Owens's serious medical needs.

For the sufficiency of the complaint, the Supreme Court has given us this guidance: "a complaint should not be dismissed for failure to state a claim unless

---

[1]The Supreme Court has set out the important policy considerations supporting the defense of qualified immunity for government officers sued for money damages in their individual capacities. See e.g. Siegert v. Gilley, 111 S.Ct. 1789, 1793 (1991); Anderson v. Creighton, 107 S.Ct. 3034, 3038 (1987); Mitchell v. Forsyth, 105 S.Ct. 2806, 2815 (1985); Harlow v. Fitzgerald, 102 S.Ct. 2727, 2736 (1982) (qualified immunity helps protect government officials from expenses of litigation, prevents diversion of energy from pressing public issues and alleviates deterrent effect of threat of lawsuits on people's acceptance of public office).

The basic law of this circuit for qualified immunity is set out in Lassiter v. Alabama A & M University, 28 F.3d 1146 (11th Cir. 1994) (*en banc*). See Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (*en banc*) ("The principles of qualified immunity set out in Lassiter v. Alabama A & M Univ., continue to be the guiding directives for deciding cases involving the question of a state actor's entitlement to qualified immunity in this circuit") (internal citation omitted).

it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 78 S.Ct. 99, 102 (1957). A complaint is also subject to dismissal under Rule 12(b)(6) when its allegations -- on their face -- show that an affirmative defense bars recovery on the claim. See Quiller v. Barclays American/Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984) *vacated on petition for rehearing*, *reinstated by* 764 F.2d 1400 (11th Cir. 1985) (saying that complaint essentially is "self-defeating" when claim adequately stated but includes matters of avoidance that preclude pleader's ability to recover, because plaintiff's "own allegations show that the defense exists"); see also, Oaxaca v. Roscoe, 641 F.2d 386, 391 (5th Cir. 1981) (saying that affirmative defense alleging failure to bring Title VII claim to EEOC in timely fashion was properly asserted in 12(b)(6) motion to dismiss); Kincheloe v. Farmer, 214 F.2d 604, 605 (7th Cir. 1954) (when "allegations of [plaintiff's] complaint erected [the affirmative defense]... it was his duty in order to extricate himself therefrom to plead any exceptions upon which he relied"); Larter & Sons, Inc. v. Dinkler Hotels Co., 199 F.2d 854, 855 (5th Cir. 1952) (holding that affirmative defense of res judicata can be raised properly and decided in 12(b)(6) motion).

Once the affirmative defense of qualified immunity is advanced, the allegations of the complaint take on great importance in a lawsuit. "Unless the

3

plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell v. Forsyth, 105 S. Ct. 2806, 2815 (1985); Behrens v. Pelletier, 116 S.Ct. 834, 840 (1996) ("At the [12(b)(6)] stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'"). The Supreme Court has urged us to apply the affirmative defense of qualified immunity at the earliest possible stage in litigation because the defense is immunity from suit and not from damages only. See Hunter v. Bryant, 112 S.Ct. 534, 536 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in the litigation."); Mitchell, 105 S.Ct. at 2815 (entitlement of qualified immunity is "immunity from suit rather than a mere defense to liability; and...is effectively lost if a case is erroneously permitted to go to trial").

We have applied the qualified immunity defense at the 12(b)(6) stage before. See, e.g., Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001); Denno v. School Board of Volusia County, 218 F.3d 1267, 1275 (11th Cir. 2000); Kyle v. Chapman, 208 F.3d 940, 943 (11th Cir. 2000); Maggio v. Sipple, 211 F.3d 1346, 1355 (11th Cir. 2000) (reversing district court's failure to grant 12(b)(6) motion to dismiss because defendants entitled to qualified immunity). We apply the qualified

4

immunity defense to dismiss a complaint at the 12(b)(6) stage where, (1) from the face of the complaint, (2) we must conclude that (even if a claim is otherwise sufficiently stated), (3) the law supporting the existence of that claim -- given the alleged circumstances -- was not already clearly established, (4) to prohibit what the government-official defendant is alleged to have done, (5) before the defendant acted.

Two more points are worth mentioning preliminarily. The complaint was drafted by lawyers. Plaintiffs have at all times been represented by legal counsel. In addition, never in the district court did Plaintiffs seek to amend the complaint (for example, by adding facts), even after the complaint's sufficiency had been specifically challenged and the qualified immunity defense expressly advanced by opposing counsel and even after a recommendation to dismiss had been made by the magistrate judge.

A complete copy of the complaint is made an appendix to this opinion. Accepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true, we will summarize the allegations.[2]

---

[2]A trial or other proceedings might show the actual facts to be different from the allegations set out here as "facts."

## I. The Allegations

While incarcerated, Plaintiffs Joe Marsh ("Marsh"), a convicted inmate, and Leroy Owens ("Owens"), a pretrial detainee (together "Plaintiffs") were assaulted and injured by other prisoners in the Butler County Jail (the "Jail"). Defendants Butler County, Alabama, and the Butler County Commission were sued as the government entities responsible under state law for properly maintaining, operating and funding the Jail.[3] Defendant Diane Harris (the "Sheriff"), Sheriff of Butler County, was sued in her individual and official capacities as the party responsible under state law for the Jail's general supervision and control.[4] The Sheriff has

---

[3]The Butler County Commission is the governing body of Butler County; so the liability analyses for the two entities are identical. They will be referred to together as the "County" for the remainder of the opinion.

[4]A reader of the complaint may wonder if the complaint actually purports to sue the Sheriff in her individual capacity. It does not.

According to Fed. R. Civ. P. 8(a), a complaint must contain, "1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, 2) a short and plain statement of the claim showing that the pleader is entitled to relief, and 3) a demand for judgment for the relief the pleader seeks."

In this case, that part of the complaint which purports to state the claim against Harris does specifically address the capacity in which the Sheriff is sued. It says these words about capacity: "Defendant Diane Harris is sued in her official capacity as Sheriff of Butler County." Thus, the complaint's "statement of a claim" does not purport to make a claim against the Sheriff in her individual capacity.

The caption to the complaint contains these words: "Diane Harris, Sheriff of Butler County, in her individual and official capacity." But the caption of the complaint is not part of the statement of the claim under Rule 8. The caption is something apart, being mandated by a different rule: Fed. R. Civ. P. 10. The caption is chiefly for the court's administrative convenience. It may, however, sometimes be useful to look at the caption -- when the Rule 8

6

acted as the final policymaker of Butler County for those aspects of jail operation under her control.

In Counts I and II of the Complaint, Plaintiffs allege that Defendants' deliberate indifference to the  unreasonably dangerous conditions at the Jail deprived Plaintiffs of their Eighth Amendment and Fourteenth Amendment rights under the United States Constitution.  In Count III of the Complaint, Owens claims that Defendants' deliberate indifference to his serious medical needs deprived him of his rights under the Fourteenth Amendment.[5]

---

statement of a claim is ambiguous about a party's capacity -- to settle pleading ambiguities. <u>See</u> <u>Hobbs v. E.E. Roberts</u>, 999 F.2d 1526, 1529-30 (11th Cir. 1993) (using several factors, including caption, to resolve ambiguity of whether official sued in official or individual capacity).  To use the Rule 10 caption to create an ambiguity when the statement of the claim is itself not ambiguous is incorrect.

Nevertheless, we accept this case and will decide this case as one in which the complaint purports to sue the Sheriff in both her official and individual capacities. The reason is that, in the district court, the parties and the district judge clearly litigated the case in that way.  The Sheriff, from the start, advanced the defense of qualified immunity: a defense that is valid only against claims asserted against a government official in her individual capacity.  Never did the Sheriff challenge the complaint on the specific ground that it did not even purport to assert a claim against her except in her official capacity.  Pursuant to Fed. R. Civ. P. 15(b), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."  Although Rule 15 uses the word "tried," we accept Rule 15(b) as a guide  -- by way of analogy, at the appellate level  -- for cases never tried, but litigated on motions.

[5]Marsh was a convicted criminal at the Jail and therefore entitled to Eighth Amendment protection.  Owens, however, was a pretrial detainee, to whom the Eighth Amendment does not apply.  <u>See</u> <u>Tittle v. Jefferson County Comm'n.</u>, 10 F.3d 1535, 1539 n.3 (11th Cir. 1994) (<i>en banc</i>) (citing <u>Ingraham v. Wright</u>, 97 S.Ct. 1401, 1412-13 n.40 (1977)).  Plaintiffs mentioned  -- but did not argue -- in a footnote in their brief to the panel that it is not altogether plain that the subjective deliberate-indifference standard applies in Fourteenth Amendment cases for pretrial detainees.  See generally <u>Tallahassee Mem'l Reg'l Med. Ctr. v. Brown</u>, 815 F.2d 1435, 1445 n.16 (11th Cir. 1987) (single footnote in appellant's brief is not enough to present issue) .  The

The Jail was an old building that had become extremely dilapidated by the summer of 1996. Inmates were able to obtain makeshift weapons by cannibalizing parts of the decaying building. Lack of adequate monitoring of the inmates allowed inmate activities to go mostly unchecked. Locks to the doors of the inmates' cells did not work, resulting in the inability of the guards to lock down the prisoners. Because prisoners were never locked down, jailers were afraid to conduct visual inspections of inmate cells on the second floor; most of the inmate population was kept on the second floor. No visual or audio surveillance system was in place on the second floor Nor, did prisoners have means to contact guards other than by screaming or banging on the walls. Jailers never conducted prisoner headcounts.

Often, only one jailer was on duty at the Jail at a time. This single jailer was responsible for controlling the entire inmate population, administering inmate

---

panel decided the case as essentially an Eighth Amendment case. Marsh v. Butler County, 225 F.3d 1243, 1256 n.6 (11th Cir. 2000). In the en banc brief, Plaintiffs, in a couple of sentences, mention the issue of possible differences between the Eighth and Fourteenth Amendments; but Plaintiffs do not argue the point. We have said that the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments. See Hamm v. DeKalb Cty., 774 F.2d 1567, 1573-74 (11th Cir. 1985)); Lancaster v. Monroe Cty., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (minimum standard for providing medical care to pretrial detainee under Fourteenth Amendment is same as minimum standard required under Eighth Amendment for convicted prisoner). Given the lack of argument, we do not consider or decide en banc whether or how the Eighth and Fourteenth Amendment standards differ. See generally Tapley v. Collins, 211 F.3d 1210, 1217 n.10 (11th Cir. 2000) (nature of briefing impacts on court's discretion to decide issues). We accept our precedents treating the Amendments as the same in the context of incarceration. We will refer to the Amendments interchangeably, most often referring to the Eighth.

intake and release, controlling the gate and fence surrounding the Jail, supervising visitation and outdoor exercise, handling mail, coordinating food service, dispensing medication, supervising trustees, answering the Jail telephone, and (at times) answering calls to the Butler County Sheriff's Department and operating the dispatch radio. Because the Jail was understaffed, inmate trustees were given many responsibilities for taking care of other inmates and maintaining the operation of the Jail.

In August 1995, the jail inspector for the Alabama Department of Corrections recommended that all Butler County jailers be trained in jail-management seminars. By the time of the incidents underlying the complaint, few jailers had been so trained. Written procedures did not govern the Jail's operations.

Inmates entering the Jail were not screened for mental impairments or for whether they had conflicts with other inmates in the Jail. No system of classification existed at the Jail: pretrial detainees were housed with convicted inmates, nonviolent offenders with violent offenders, juveniles with adults, and mentally ill persons with those in good mental health. Never were prisoners disciplined or segregated for assaulting other inmates, destroying jail property, or threatening jailers. The Jail contained four eight-person cells, one four-person cell,

9

trustee cells, two holding cells, one isolation cell and a cell for female inmates; but sometimes more than 50 inmates were imprisoned at the Jail.

Jail Administrator Thelma Teague ("Teague") told the Sheriff several times that the Jail needed more staff. In February 1996, the jail inspector for the Alabama Department of Corrections informed Defendants that the Jail was not reasonably secure. Defendants also received many complaints and requests for assistance from prisoners. A letter from prisoner-rights advocates told Defendants that the Jail conditions posed "an immediate and serious threat to the safety of the inmates" and made inmates "highly vulnerable to assault by other inmates."

On 2 July 1996, four inmates assaulted Joe Marsh in his cell. He was struck in the head with a metal pipe, beaten for several minutes, and cut with a screwdriver. During the assault other inmates yelled and banged on the walls attempting to get the attention of jailers. No jailer came upstairs until 10 to 15 minutes after the assault ended. Marsh suffered lacerations across his forehead, on the back of his head and on his back. The bone above his eyebrow was broken. Marsh was taken to a hospital where he received medical treatment for his injuries. His left eye now droops, and he has nerve damage in his forehead as a result of the assault. He continues to suffer from frequent headaches and nightmares.

10

The four attackers were never disciplined for the assault on Marsh. Two days later (and after the attack on Owens) one of the four attackers discharged a fire extinguisher into Marsh's cell where he was resting, nearly suffocating him.

Owens, a paranoid schizophrenic, was a pretrial detainee who was placed in the general population at the Jail. On 3 July 1996, the same four inmates who assaulted Marsh attacked Owens.

Owens was attacked in the dayroom on the second floor. He was hit in the head with a metal pipe and hit with a watercooler. His head was smashed into a table, and he was kicked, stomped, stabbed and beaten for 30 minutes to an hour. Other inmates called for the jailer to assist Owens. During the assault, the attackers returned to their cells when they suspected a jailer was on the way. When the attackers realized that no help for their victim was coming, they returned to the dayroom to continue the assault.

When the assault started, only one jailer was on duty. When he heard the cries for help he called the Greenville City Police. When the police arrived, they refused to go onto the second floor. The jailer called the Sheriff and Jail Administrator Teague, but both refused to come to the Jail. Chief Deputy Hartley ("Hartley") was called and did come to the Jail.

11

Twenty minutes after the assault ended, Hartley walked upstairs and brought Owens downstairs. Owens was taken to a hospital shortly after midnight on 4 July. His injuries were treated. Owens was discharged from the hospital to the care of the Butler County Sheriff's Department. Two deputies signed a discharge sheet which instructed them to monitor Owens's level of consciousness, pupils, vision, and coordination, and to call the hospital immediately if a change occurred. Back at the Jail, Hartley instructed Owens to sign his own bond, pursuant to Defendants' policy and custom of releasing sick or injured inmates. Hartley then drove Owens to a motel near the I-65 interstate highway and released him. Owens's clothes were bloody, and he was in his bare feet. The clerks at the motel refused to rent him a room and called the police. The police officer who responded to the call followed Owens as he wandered across the I-65 overpass and then ordered the clerk another motel to rent Owens a room.

Owens awoke the next day in terrible pain and called his grandmother's house. His sisters came to the motel where Owens had spent the night. An ambulance was called, and Owens returned to the hospital where a doctor prescribed pain medication. Because of the assault at the Jail, Owens still experiences pain and limited mobility in his right shoulder and uncontrollable shaking in his right arm.

12

## II.    Proceedings in the District Court

Plaintiffs filed their complaint in 1997.  Without filing an answer,

Defendants filed their motions to dismiss.  The Sheriff's motion, among other

things, asserted qualified immunity.  Plaintiffs filed responses to the motions.  The

magistrate judge made his recommendations to grant Defendants' motions to

dismiss.  Plaintiffs filed their objections to the magistrate's recommendations with

the district court.  The district court adopted, approved and affirmed the magistrate

judge's recommendations and granted the County's and the Sheriff's motions to

dismiss.

## III.  Claims Against The County for Jail Conditions[6]

---

[6]We address the claims against the County in detail only for the conditions of confinement. Plaintiffs also allege deliberate indifference to Owens's serious medical needs based on his release.  They make this claim against Defendants in general, which would seem to include the County.  Nothing indicates, however, that the County was involved in the alleged deprivation of medical care to Owens.  Moreover, under Alabama law the County is not responsible for assuring procedures are in place for inmates to get medical care.  Alabama law assigns counties a "limited role in building and funding the jails."  See Turquitt v. Jefferson Cty., Ala., 137 F.3d 1285, 1290 (11th Cir. 1998) (*en banc*).  Therefore, the County is not a responsible party for the alleged tort of deliberate indifference to Owens's medical needs.  This claim was properly dismissed against the County.   Therefore, this opinion will address the deliberate-indifference-to-serious-medical-needs claim (Count III) only in the context of the Sheriff's liability.

13

The Eighth Amendment prohibits cruel and unusual punishment. The Supreme Court says that prison officials will be liable for violating the Eighth Amendment when they are deliberately indifferent to the substantial risk of serious harm to inmates. Put differently, officials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk. See Farmer v. Brennan, 114 S.Ct. 1970, 1982-83 (1994).

A local government can be directly responsible for a constitutional violation due to its acts or omissions. See Pembaur v. City of Cincinnati, 106 S.Ct. 1292, 1298 (1986) ("a municipality may be liable under section 1983 for a single decision by its legislative body...") (citing Owen v. City of Independence, 100 S.Ct. 1398 (1980); Newport v. Fact Concerts, Inc., 101 S.Ct. 2748 (1981)). A local government, however, will be liable under section 1983 only for acts for which the local government is actually responsible. Turquitt v. Jefferson Cty., Ala., 137 F.3d 1285, 1287 (11th Cir. 1998). Alabama counties have no responsibility for daily operation of county jails and no authority to dictate how jails are run, but the County is charged with erecting and maintaining jails.[7] Id. at 1289-90. Therefore,

---

[7]The County has the duty to construct and to maintain a jail of sufficient size and strength to house the inmates. See Ala.Code §§ 11-14-10, 11-14-13 (1989). Looking to Alabama case law to define the County's responsibilities under the statute, we see that "the [Alabama] legislature intended to require the county commission to keep a jail and all equipment therein in a state of repair to preserve it from failure or decline." Keeton v. Fayette Cty., 558 So.2d 884, 886 (Ala.1990) (summary judgment for County improper when Plaintiff alleged negligence in County's maintenance of jail); cf. Turquitt, 137 F.3d at 1290 (en banc) (concluding no county

14

the County will have violated Plaintiffs' Eighth Amendment rights if its failure to maintain the Jail constituted deliberate indifference to a substantial risk of serious harm to the prisoners.

Plaintiffs allege in the complaint that the physical conditions of the Jail, the maintenance of which was the County's responsibility, presented an objective substantial risk of serious harm to the inmates. They allege the locks on the doors to cells did not work, preventing inmates from being locked down. The structure of the Jail was so dilapidated that inmates could fashion weapons from pieces of the building. And no video or audio surveillance system was in place to check on the inmates.

Plaintiffs allege that the County was aware of the conditions. Plaintiffs say these things put the County on notice: a report from the Alabama Department of Corrections filed in February 1996; faultfinding inspection reports from several state agencies; complaints from prisoners; a letter (outlining dangerous conditions) from a prisoner-rights advocacy organization; and a complaint filed in a lawsuit on 14 May 1996, seeking declaratory and injunctive relief on behalf of the prisoners in the Jail.

---

liability for improper operations of the jail). Under Alabama law, a county might be liable when the physical conditions of the jail have deteriorated and pose a serious threat to the safety of inmates and when those conditions have caused the injury to the inmates.

We accept that conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates. In addition, Plaintiffs' allegations that the County received many reports of the conditions but took no remedial measures is sufficient to allege deliberate indifference to the substantial risk of serious harm faced by inmates in the Jail.

Plaintiffs' complaint also properly alleges the causal connection between the County's failure to maintain the Jail and the assaults on Marsh and Owens. For example, that the locks on the doors to cells did not work prevented the isolation of prisoners from each other and gave attackers ready access to Plaintiffs. We conclude that Plaintiffs sufficiently allege a constitutional violation by Butler County to survive the County's motion to dismiss.

## IV. The Claims Against Sheriff Harris

A. Official-Capacity Claims Against the Sheriff

Authority over inmates is expressly granted to Alabama Sheriffs. See Turquitt, 137 F.3d at 1289 (saying "the sheriff has control over the inmates in the

16

jail, the employees of the jail, and the jail itself" and the "sheriff [] has the duty to ensure that inmates do not come to harm" (citing Ala. Code § 14-6-1)). The authority the Sheriff has over the Jail is totally independent of the county commission; so, the "sheriff acts exclusively for the state rather than for the county in operating a county jail." Id. at 1288. For this reason, Alabama sheriffs are considered arms of the state and protected by sovereign immunity in suits against them in their official capacity. The complaint against the Sheriff in her official capacity was thus properly dismissed. The Sheriff can be subject to suit only in her individual capacity, to which she might be entitled to qualified immunity.

B.    Individual-Capacity Claims Against Sheriff Harris for Conditions at the Jail (Counts I and II)

To overcome a Rule 12(b)(6) motion based on the defense of qualified immunity, Plaintiffs must allege conditions that, in the light of the already clearly established law at the time of the incident, obviously amounted to cruel and unusual punishment under the Eighth Amendment. In the qualified immunity analysis, we generally first determine whether a plaintiff has stated a claim for a

17

constitutional violation at all.  See Stanley v. City of Dalton, 219 F.3d 1280, 1285 (11th Cir. 2000).

A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.  See Helling v. McKinney, 113 S.Ct. 2475, 2480 (1993).  An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not "respond[] reasonably to the risk."  Farmer v. Brennan, 114 S.Ct. 1970, 1982-83 (1994).  A plaintiff must also show that the constitutional violation caused his injuries.

In Farmer, the Court was chiefly concerned with defining the level of intent required of an official to violate the Eighth Amendment -- the subjective element of the tort; but Farmer also explained that two objective elements are part of an Eighth Amendment violation.  First, an objectively substantial risk of serious harm to prisoners must exist.  See Id. at 1977.  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner. See Id. at 1983.

In this case, Plaintiffs allege these conditions at the Jail: 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from

18

those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.

Taken as a whole, these alleged conditions, if true, present an objectively substantial risk of serious harm -- including the risk of inmate-on-inmate attacks -- to inmates. This risk violates the Eighth Amendment's requirement "that inmates be furnished with basic human needs, one of which is 'reasonable safety.'" Helling, 113 S.Ct. at 2480-81 (quoting DeShaney v. Winnebego, 109 S.Ct. 998, 1005 (1989)).

19

Plaintiffs also allege that Harris was aware of the risk: she was provided with faultfinding, inspection reports by state agencies, reports outlining the conditions that existed at the Jail; with many complaints from prisoners and requests for assistance; with correspondence from prisoners' lawyers detailing the staffing problems and warning of a "serious threat to the safety of inmates"; and with a lawsuit filed in the district court in May 1996, seeking injunctive and declaratory relief on behalf of the inmates at the Jail. In addition, the conditions at the Jail are alleged to be longstanding and pervasive. These allegations are sufficient to plead that the Sheriff was subjectively aware of the substantial risk to inmate safety at the Jail. See Farmer, 114 S.Ct. at 1979 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Still, a prison official will only violate the Eighth Amendment if the official's response to the conditions posing the substantial risk of serious harm is unreasonable. See Farmer, 114 S.Ct. at 1982-83. Plaintiffs allege that Harris did absolutely nothing to alleviate the conditions at the Jail, despite repeated warnings and recommendations for how conditions could be improved. This alleged lack of action is not reasonable under the alleged circumstances.

Plaintiffs also allege that the dangerous conditions caused their injuries.

Conditions, like those in this case, where violent prisoners are allowed free reign of

a jail with easy access to weapons without proper supervision by guards could be

found to have caused the assaults on Plaintiffs.

We conclude that Plaintiffs adequately allege 1) an objective, substantial risk

of serious harm to inmates existed, 2) the Sheriff was subjectively aware of this

risk, 3) the Sheriff responded in an objectively unreasonable way to this known

risk, and 4) the constitutional violation caused Plaintiffs' injuries. Plaintiffs,

therefore, allege sufficiently that Sheriff Harris violated their Eighth Amendment

rights.

But, the Sheriff, in her individual capacity, might be entitled to qualified

immunity -- barring Plaintiffs' suit against her -- even if the complaint states an

otherwise valid claim for an Eighth Amendment violation.[8] See Lassiter v.

---

[8]"A claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." Mitchell, 105 S. Ct. at 2816; Saucier v. Katz, 121 S.Ct. 2151, 2154 (2001) (ruling on qualified immunity requires a separate analysis "not susceptible of fusion with the question of whether there was [a constitutional violation]"). For example, as we have just discussed, if a sheriff responds reasonably to unsafe jail conditions, the sheriff will avoid liability on the merits of an Eighth Amendment claim. But, in addition, if a sheriff responds in an arguably reasonable way to unsafe jail conditions, the sheriff will avoid suit pursuant to the defense of qualified immunity. See Lassiter, 28 F.3d at 1149 ("Unless a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.") (citing Malley v. Briggs, 106 S.Ct. 1092, 1096-97 (1986)); cf. Post v. City of Fort Lauderdale, 7 F.3d 1552, 1558 (11th Cir. 1993) ("When an officer asserts qualified immunity, the issue is not whether probable cause existed in fact, but whether the officer had 'arguable' probable cause to arrest.").

Alabama A & M Univ., 28 F.3d 1146, 1151 (11th Cir. 1994) (*en banc*)(saying

"[i]mmunity contemplates exemption from liability that would otherwise exist on

the merits").  A government-officer defendant is entitled to qualified immunity

unless, at the time of the incident, the "preexisting law dictates, that is, truly

compel[s]," the conclusion for all reasonable, similarly situated public officials that

what Defendant was doing violated Plaintiffs' federal rights in the circumstances.

Id. at 1150.

---

Government officials are not required to err on the side of caution. See Davis v. Scherer, 104 S.Ct. 3012, 3020 (1984).  And qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Butz v. Economou, 98 S.Ct. 2894, 2911 (1978). Qualified immunity is meant to allow government officials to act with "independence and without fear of consequences" when the law is not clearly established.  Id. at 2739.

Take a complaint's facts as true.  If reasonable people could disagree about whether a sheriff -- in the light of the then clearly established law -- responded reasonably to the complaint's alleged circumstances, qualified immunity must apply: the sheriff has responded in an arguably reasonable way.  The plaintiff's allegations on their face show that relief against the official, in his individual capacity, is barred by the defense of qualified immunity.  The law applicable to the alleged circumstances facing the official was not already clearly established, that is, a reasonable government official could not truly know when he acted whether the acts were lawful or unlawful under the federal law.  See Harlow v. Fitzgerald, 102 S. Ct. at 2738 (official could not "fairly be said to 'know' that the law forbade conduct not previously identified as unlawful" when law not clearly established).

For a court to conclude that -- in the light of the clearly established law at the pertinent time -- a hypothetical jury, considering all the complaint's alleged facts as true, could decide that the defendant responded unreasonably is not sufficient to overcome the qualified immunity defense raised in a Rule 12(b)(6) motion.  This formulation is nothing more than saying that reasonable people might or might not think -- this is, could disagree about whether -- the government actor behaved unreasonably.  It is this kind of situation -- that is, one where the alleged facts (accepted as true) leave the legal consequences uncertain -- for which the defense of qualified immunity was designed.

In Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994), we see some dicta: "a finding of deliberate indifference necessarily precludes a finding of qualified immunity".  We reject that dicta because it incorrectly jumbles the merits of an Eighth Amendment violation with the separate concept of an immunity defense.

22

When looking at the preexisting case law, courts, dealing with qualified immunity defenses, must always keep in mind the great distinction between following a precedent and extending a precedent. Two sets of circumstances may be "nearly" the same, but "nearly" can make a great legal difference at the edge. Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law.

The deliberate indifference standard of the Eighth Amendment basically places a duty on jailers to act reasonably to keep inmates safe. A "duty-to-act-reasonably" standard, by itself, is almost always too general a proposition to give meaningful notice to a public official that what he, in the specific circumstances, is doing violates established federal law.[9] See generally, Stornelli v. United States

---

[9]We acknowledge that preexisting case law, tied to the precise facts, is not in every situation essential to establish clearly the law applying to the circumstances facing a public official so that a reasonable official would be put on fair and clear notice that specific conduct would be unlawful in the faced, specific circumstances. See United States v. Lanier, 117 S.Ct. 1219, 1227 (1997) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.") (discussing 18 U.S.C. § 242); Lassiter, 28 F.3d at 1150 n.4 (leaving open possibility that "occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law"); Preister v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (recognizing narrow exception of not requiring preexisting case law when "the official's conduct 'was so far beyond

23

Gypsum Co., 134 F.2d 461, 462 (2nd Circuit 1943) (Learned Hand, J.) (where the

court was comparing jury's responsibility in applying specific duty imposed by

---

the hazy border' between constitutional and unconstitutional conduct, that the official had to
know he was violating the Constitution [the Fourth Amendment] even without caselaw on
point") (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).

Some general statements of law are capable of giving fair and clear warning in some
circumstances: the occasional "obvious clarity" cases per Lanier. But in other cases, as Lanier
says, "a very high degree of prior factual particularity may be necessary." 117 S.Ct. at 1227.
Especially where the applicable legal standard is a highly general one, such as "to act
reasonably" or "to act with probable cause," preexisting case law, that has applied the general
law to specific circumstances, will almost always be necessary to draw the bright line that is
capable of honestly giving fair and clear notice that an official's conduct will violate federal law.
See Anderson, 107 S.Ct. at 3040 (noting that pertinent qualified immunity question in probable-
cause case is "fact-specific" question of whether a reasonable official could have believed, in
light of clearly established law, that official's behavior was lawful under circumstances);
Lassiter, 28 F.3d at 1150 (en banc) (stating that "general propositions" have little to do with
qualified immunity, and the bright line that must be crossed to surrender qualified immunity "is
not found in abstractions --  to act reasonably, to act with probable cause, and so forth -- but in
studying how these abstractions have been applied in concrete circumstances") (quoting Barts,
865 F.2d at 1194); Adams v. St. Lucie Sheriff's Dept., 962 F.2d 1563, 1573, 1575 (Edmondson,
J., dissenting) approved en banc, 998 F.2d 923 (11th Cir. 1993) ("[w]hen considering whether
the law applicable to certain facts is clearly established, the facts of the cases relied upon as
precedent are important. The facts need not be the same as the facts of the immediate case. But
they do need to be materially similar."); Jenkins, 115 F.3d at 826 (reasonableness standard was
not principle that provided adequate warning because that general standard could not apply with
"obvious clarity" to concrete circumstances faced by school officials). See also Saucier v. Katz,
121 S.Ct. 2151, 2156 (2001) ("This inquiry [whether a legal right was already clearly
established], it is vital to note, must be undertaken in light of the specific context of the case, not
as a broad general proposition"); Wilson v. Layne, 119 S.Ct. 1692, 1699-70 (1999) (saying "the
right allegedly violated must be defined at the appropriate level of specificity...."). Thus, in the
present case, when we have denied qualified immunity, we have done so because we believe that
fact-specific, preexisting case law did put reasonable sheriffs on clear notice given the alleged
circumstances.

The defense of qualified immunity bars absolutely a judge and jury from making, in
effect, new law for a case to fit the particular circumstances that faced the public official at the
time of the pertinent event and then applying this new law basically retroactively in the case to
make an award of damages. If a public official is to be punished by an imposition of damages
against him personally, the punishment must be for violating some clear, legal duty he – in the
light of the specific circumstances before him – plainly already had at the time of the pertinent
event, and not for violating what is, in effect, some new legal duty recognized or announced by
the judge and jury in the official's trial, long after the time of the pertinent event.

24

statute to that imposed by common law duty to take reasonable care saying "[i]t is true we think of the common-law duty as though it were imposed before the event, because it demands only 'reasonable' care; but that does not specify the conduct required and creates a duty incapable of being known in advance, and it is ascertained and imposed only retroactively...it is legislation in parvo [in little]").

When the facts of previous precedents are necessary to give clear warning that certain conduct in specific circumstances will violate federal law, we must look at the facts in the precedent and at the facts that confronted the government official in the case before the court. The two sets of facts must be materially similar. For qualified immunity purposes, a preexisting precedent is materially similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official <u>might</u> make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. But minor variations in some facts (the precedent lacks an arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances

25

facing an official materially different from the preexisting precedents, leaving the law applicable -- in the circumstances facing the official -- not clearly established when the defendant official acted.

To apply properly this "materially similar" principle, the court, surveying the relevant area of law, must discern the facts that were material to the federal law violation in similar preexisting cases.[10] These facts then must be compared to the facts alleged in the case before the court. If there is an absence of a fact (or the presence of an additional fact) in the case before the court, the court must determine whether that fact might make a difference to any reasonable official who had to determine whether his conduct violated federal law in the circumstances in the immediate case. If the court determines that the variance might make a difference, the precedent -- when factual particularity is needed to establish the law -- cannot clearly establish the law applicable to the circumstances facing the defendant.

---

[10]When case law is needed to "clearly establish" the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state. See Jenkins, 115 F.3d at 827 n.4. We do not understand Wilson v. Layne, 119 S.Ct. 1692 (1999), to have held that a "consensus of cases of persuasive authority" from other courts would be able to establish the law clearly. Id. at 1700. Each jurisdiction has its own body of law, and splits between jurisdictions on matters of law are not uncommon. We do not expect public officials to sort out the law of every jurisdiction in the country.

The district court in this case concluded the preexisting law was not clearly established, at the pertinent time, that the conditions at the Jail posed a substantial risk of serious harm to prisoners in the Jail. The district court recognized the troubling conditions at the Jail; but the district court seemed to conclude that, because this case presented no allegations of past serious injuries to prisoners at the Jail, the preexisting case law was too different from this case to have clearly established the law applicable to the alleged circumstances. We think the district court erred.

We accept that at least three of our decisions did clearly establish, at the pertinent time, that the conditions of confinement Plaintiffs allege did pose a substantial risk of serious harm to inmates. See Hale v. Tallapoosa County, 50 F.3d 1579 (11th Cir. 1995); Williams v. Edwards, 547 F.2d 1206 (5th Cir. 1977); Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974).[11] These cases contained facts on the conditions of confinement very similar to the facts alleged in this case on the conditions of confinement.[12]

---

[11]In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted all decisions of the Fifth Circuit handed down prior to close of business on 30 September 1981 as binding precedent in this circuit.

[12]In Hale, evidence was presented of these conditions: 1) prisoners were not segregated based on their proclivity for violence, 2) there was only one jailer on duty, 3) the jailer's quarters were out of earshot and eyesight of the prisoners' cell, and 4) fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization. In Williams, the court concluded that the totality of the circumstances posed a substantial risk of

It is true that each of these earlier cases also had, as part of the facts, that the pertinent institution had a history of inmate assaults with serious injuries. And this case lacks that alleged fact. But that factual variance cannot make a difference. As the Supreme Court had written (before the Plaintiffs were injured in the case), an Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred. See Helling, 113 S.Ct. at 2481 (Eighth Amendment protects against sufficiently imminent dangers as well as current unnecessary and wanton infliction of harm); see also Collier, 501 F.2d at 1300-01 (concluding that risk to inmates posed by exposed electrical wiring, deficient firefighting measures and mingling of inmates with contagious diseases constituted Eighth Amendment violation even though no showing was made that

---

serious harm due to inmate violence. The circumstances in the prison showed this environment: 1) widespread possession of weapons, 2) no confiscation of weapons, 3) no segregation of violent from nonviolent inmates, 4) previous assaults, 5) overcrowding, 6) too few guards to supervise properly inmates, and 7) multiple reports of stabbing, some resulting in death. In Collier, the court concluded that these conditions pose a serious risk of harm to inmates: 1) possession of weapons by prisoners, 2) no established procedure for confiscating weapons, 3) lack of classification according to severity of offense, 4) no procedure for reporting previous assaults, 5) overcrowding, 6) lack of supervision by guards, 7) custodial responsibility assigned to incompetent and untrained inmates, and 8) at least 27 reported instances of armed assaults by inmates on other inmates.

In this case, Plaintiffs allege these things: 1) widespread possession of weapons by inmates, 2) weapons were not confiscated from prisoners, 3) no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 4) no discipline of inmates for violent behavior and previous assaults on other inmates, 5) at times the Jail housed more prisoners than the cells could accommodate, 6) the Jail was understaffed, 7) inadequate supervision by jailers, and 8) unsupervised prisoner trustees had custodial duties for other prisoners.

28

prisoners had been injured or had contracted disease due to these conditions).  See generally Farmer, 114 S.Ct. at 1983 (relief  available to plaintiff subjected to unsafe conditions even if no harm has yet befallen him).

We conclude, considering the preexisting case law of this circuit (which had cases with very similar facts) and of the Supreme Court (which made it plain that lack of physical injury did not mean that no Eighth Amendment violation had been established), that no reasonable sheriff could have concluded that the alleged conditions at the Jail failed to pose a substantial risk of serous harm, although no serious injury was alleged to have occurred at the Jail before the injuries suffered by Plaintiffs.  That the alleged jail conditions posed no substantial risk of serious harm is incapable of being convincingly argued, considering the preexisting law.

Given that a substantial risk of serious harm was present, an Eighth-Amendment defendant might still be entitled to qualified immunity on a different basis: if he responded in a way that was arguably reasonable -- in the light of the clearly established preexisting law -- to the substantial risk of serious harm to inmates.  But at the time of the assaults in this case, it was clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions -- like the conditions alleged in this case -- that pose a risk of serious physical harm to inmates.  See LaMarca v. Turner, 995 F.2d

29

1526, 1537-38 (11th Cir. 1993) (noting number of measures prison official should have taken to respond to unconstitutional conditions at prison).

In this case, Plaintiffs allege that no measures were taken to improve conditions at the Jail. For example, the locks on the cells were never fixed; and supervision of the inmates was never improved. We conclude, therefore, that Plaintiffs adequately allege facts which (if true) show that, at the time of the incident, the Sheriff's acts were not even arguably reasonable in the light of the clearly established law.

On the jail conditions, the Sheriff -- at the Rule 12 stage -- is unentitled to qualified immunity for the claim that she was deliberately indifferent to the threat of serious harm to Plaintiffs.

C.    Individual-Capacity Claims against Sheriff Harris for Deliberate
      Indifference to Plaintiff Owens's Serious Medical Needs (Count III)

Plaintiff Owens's claim against the Sheriff for deliberate indifference to his serious medical needs fails to state a claim upon which relief can be granted.[13] We

_____

[13]In the law, being released completely from confinement seems to be something different from a condition of confinement. The deliberate indifference standard has been used for conditions-of-confinement cases. Today, when the act that is supposed to be wrongful is a total release from custody, we have accepted -- because no one argued otherwise -- that the deliberate indifference standard would be the correct one to apply. We have looked at the complaint in that light and with an eye on Farmer v. Brennan, 114 S.Ct. 1970 (1994). We, however, do not rule out that, if a total release from confinement can violate a prisoner's federal

30

stress that the deputy who released Owens in the manner alleged in the complaint was not sued; so, his situation is not before us.  We also stress that the Sheriff can have no respondeat superior liability for a section 1983 claim.  See Geter v. Wille, 846 F.2d 1352, 1354 (11th Cir. 1988) ("Supervisory officials cannot be held liable for the acts of employees solely on the basis of respondeat superior.").  See also Polk County v. Dodson, 102 S.Ct. 445, 453 (1981) ("Section 1983 will not support a claim based on a *respondeat superior* theory of liability.").  Owens makes no allegation that the Sheriff personally participated in Owens's release.  Nor does Owens allege that the Sheriff was aware of the particular circumstances of Owens's medical condition when he was released or of the manner of his release on the night of the assault.[14]  The Sheriff's potential liability, therefore, can be only

---

rights at all, he might have to show the release was done "maliciously and sadistically for the very purpose of causing harm."  See generally Id. at 1978.  What standard is applicable seems questionable.  We leave the question undecided because it has not been raised, argued or briefed in this case.  We also do not take into account the debatable nature of this most basic question when we write about whether the law was clearly established for the purposes of qualified immunity.

[14]The complaint does allege that the Sheriff was called by a deputy during the assault of Owens at the Jail and that the Sheriff did not come to the Jail.  The Chief Deputy came. Nothing alleges that the Sheriff was aware of who was being assaulted, the severity of the assault, or that an inmate would have to go to the hospital.  According to the complaint, Owens received medical care after the time of the call to the Sheriff.  There is no allegation that the Sheriff was aware of Owens's condition after he received the medical care at the hospital or aware that Owens was going to be released from the Jail or that the Sheriff refused to listen or to confer with the Chief Deputy about whether or how Owens should be released.

policymaker liability. But the complaint is insufficient to state a claim against the Sheriff as a policymaker.[15]

Owens alleges that the Sheriff had a "policy of releasing sick or injured inmates," and concluded that the policy was "developed and implemented... with deliberate indifference to the medical needs of Owens after his assault."[16] Owens alleges no facts from which a fact-finder could find that the Sheriff actually knew

---

[15]Before the complaint was dismissed, Plaintiffs were on notice that they might not have sufficiently alleged that the Sheriff was deliberately indifferent to Owens's medical needs. The Sheriff's motion to dismiss argued that Plaintiffs failed to allege a constitutional violation because they failed to allege "personal participation," or "any type of policy she enacted which caused the injuries."

The magistrate judge's recommendations concluded that Plaintiffs failed to allege an Eighth Amendment violation. Plaintiffs filed objections to the magistrate judge's recommendation but did not seek to amend the complaint. Even after the district court dismissed their claims, Plaintiffs did not seek to amend the complaint. When Plaintiffs have had ample opportunity to request to amend their complaint, but have failed to do so, nothing compels us to remand to allow them to amend. See Burger King Corp. v. Weaver, 169 F.3d 1310, 1318 (11th Cir. 1999) (where we affirmed dismissal without remand to amend when plaintiff failed to request leave to amend the complaint in district court); Long v. Satz, 181 F.3d 1275, 1280 (11th Cir. 1999) (same). See generally  Warth v. Seldin, 95 S. Ct. 2197, 2206-7 (1975) (concluding, in context of motion to dismiss for lack of standing, that after opportunity to amend to include "particularized allegations of fact deemed supportive of plaintiffs standing," complaint must be dismissed if standing not adequately apparent from complaint).

[16]In the light of the usual pleading requirements of Fed. Rule Civil Proc. 8(a), unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal. See Stanton v. United States, 434 F.2d 1273, 1276 (5th Cir. 1970). See also Associated Builders, Inc. v. Alabama Power Co., 505 F.2d 97, 100 (5th Cir. 1974). We count the "developed and implemented . . . with deliberate indifference to the medical needs . . . ." language in this unsupported-conclusion category. See generally Mass. School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998) (a review court need not "swallow plaintiff's invective hook, line and sinker; bald assertions unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited").

that her release policy posed a sufficiently substantial risk of serious harm to inmates.

Owens does not allege that the Sheriff -- on or before 3 July 1996 -- was aware of earlier violations of Eighth and Fourteenth Amendment rights flowing from this kind of policy or from the release of other sick or injured inmates. Cf. Chestnut v. City of Quincy, 513 F.2d 91, 92 (5th Cir. 1975)(indicating that complaint alleging police supervisor had notice of past culpable conduct of subordinates and failed to prevent recurrence of such misconduct states section 1983 claim for personal liability). Owens never alleges one such bad, earlier release incident at the jail.

An official cannot be held liable just for instituting a facially constitutional policy. See City of Canton v. Harris, 109 S.Ct. 1197, 1204 (1989) (saying no policymaker liability exists when subordinate applies facially valid constitutional policy in unconstitutional manner). See also Schmelz v. Monroe County., 954 F.2d 1540, 1544 (11th Cir. 1992 ) (concluding no personal liability for Sheriff who instituted facially constitutional policy). Cf. Monell v. Department of Social Servs., 98 S.Ct. 2018 (1978) (holding municipality liable for facially unconstitutional policy).[17]  In this case, Owens alleges that the Sheriff had a policy

---

[17]In considering the Sheriff's potential personal liability as a policymaker, we have looked at decisions involving the liability of local governments as policymakers.  The local government

of releasing sick or injured inmates. We believe such a policy, on its face, violates no constitutional guarantees and is not a facially unconstitutional policy. See United States v. Salerno, 107 S. Ct. 2095, 2100 (1987) (for policy to be facially unconstitutional it is required "that no set of circumstances exists under which the Act would be valid"). As Plaintiffs' counsel wrote in their Reply Brief, such a release policy could be applied humanely and properly. We specifically reject the idea that the policy, on its face, is "obviously" a danger to inmates to the degree that the allegation of the policy itself is an allegation of personal awareness on the Sheriff's part of an excessive risk of serious harm to inmates just because the policy exists.

Owens's allegation that the way the policy was applied by the Chief Deputy for Owens's release violated his federal rights is also insufficient to state a claim against the Sheriff personally. See Pembaur v. City of Cincinnati, 106 S.Ct. 1292, 1300 n.11 (1986) (discussing City of Oklahoma City v. Tuttle, 105 S.Ct. 2427 (1985), and saying that single incident of unconstitutional conduct by nonpolicymaking official is insufficient to show that the "unconstitutional act was

---

precedents are not directly on point. The reason is that the standard for imposing policymaker liability on a local government is more favorable to plaintiffs than is the standard for imposing policymaker liability on a Sheriff or other jail official in his personal capacity in a case like this one. Farmer, 114 S.Ct. at 1981. Still, the local government cases can guide us by analogy; if a local government would not be liable as a policymaker a fortiori there is no personal liability.

taken *pursuant to* a municipal policy" (emphasis in the original)).  See also

Caldwell v. City of Englewood, 959 F.2d 670 (7th Cir. 1992) (explaining that

allegation of single incident does not support reasonable inference of policy or

custom).  As we have already said, Owens -- when he alleges the wrongful release

of a sick or injured inmate -- alleges only the single incident involving him.  He

alleges no past pattern of inmate releases that, if proved, might support that this

Sheriff had a policy or custom of releasing inmates with deliberate indifference to

their serious medical needs.

For similar reasons, Owens has failed to allege sufficient facts showing that

the Sheriff can be held personally liable for inadequate training about the manner

of releasing sick or injured inmates.  Unless a policymaker knows of the need to

train an officer in a particular subject area, no liability can arise from failure to

train him.  See Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998).

Owens never alleges that he was wrongfully released because Chief Deputy

Hartley, the person who actually released him, was inadequately trained to deal

with the usual and recurring situations of releasing sick or injured inmates.  The

complaint does say, when describing the general jail conditions, that the state

corrections department had "recommended" that all jail employees be trained at jail

management seminars and that, by 1996, "almost no one who worked at the jail  --

35

including the sheriff, the jail administrators, and most jailers" had been professionally trained. But the complaint allegations never say that Chief Deputy Hartley did not have the recommended professional training. And the complaint never says that the "on the job" training for release of inmates was inadequate. Moreover, the complaint does not say that Chief Deputy Hartley released Owens in the manner he did because of inadequate training. Furthermore, the complaint does not allege facts indicating that the Sheriff knew that Deputy Hartley's lack of training (if any) about releasing inmates posed an excessive risk of serious harm to inmates. And from the well-pleaded factual allegations in the complaint, no inferences can be reasonably drawn to make up for the missing facts. "[P]leadings must be something more than an ingenious academic exercise in the conceivable." United States v. Students Challenging Regulatory Ag. Proc., 93 S. Ct. 2405, 2416 (1973).

About his release from jail, the information presented in the complaint is insufficient. For Count III, Owens has failed to state a claim for a constitutional violation against the Sheriff personally -- as a policymaker.

Even if the complaint did state a claim against the Sheriff for a constitutional violation on account of the policy of releasing sick or injured inmates, we -- in the alternative -- conclude that the Sheriff would be entitled to qualified immunity. To

defeat the Sheriff's qualified immunity defense, Owens must show that the preexisting applicable law was so clearly established in July 1996 that every reasonable Sheriff would have known that releasing sick and injured inmates would violate the constitutional rights of inmates. This legal clarity did not exist.

The Constitution, on its face, says nothing about medical care due inmates. The right to medical care was inferred by the Supreme Court. See, e.g., Estelle v. Gamble, 97 S.Ct. 285, 290 (1976); Helling, 113 S.Ct. at 2480. And the scope of that right is, therefore, necessarily defined by case law. In July 1996, no case law established that releasing a sick or injured prisoner violated a constitutional right to receive care for a serious medical condition. To the best of our knowledge, no reported decision in this country had ever held such a thing.

In Estelle, the Supreme Court interpreted the Eighth Amendment's words against "cruel and unusual punishments," and, for the first time, determined that governments -- presented with an inmate with a serious medical condition -- had an "obligation to provide medical care for those whom it is punishing by incarceration." Estelle, 975 S.Ct. at 290. The Court reasoned that, "[a]n inmate must rely on prison authorities to treat his medical needs; if authorities fail to do so, those needs will not be met." Id. Under Estelle, the critical fact supporting the

obligation on the government is the fact of incarceration: the prisoner cannot get his own care, nor can anyone from outside the jail get to him to help him.

In 1989, the Supreme Court restated this rationale -- the importance of confinement -- in <u>DeShaney v. Winnebago County Dept. of Social Services</u>, 109 S.Ct. 998 (1989), a Fourteenth Amendment case. The Court wrote "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." <u>Id.</u> at 1005-06.

It is the <u>Estelle</u> line of cases, cases which deal with deliberate indifference to an inmate's serious medical needs, that bears the most on our study of the preexisting law and this case. <u>See</u> <u>Helling</u>, 113 S. Ct. at 2480; <u>West v. Atkins</u>, 108 S.Ct. 2250, 2258 (1988) (saying that in <u>Estelle</u> the Court held that the State has constitutional obligation to provide adequate medical care to those whom it has incarcerated because inmate must rely on prison authorities to treat his medical needs); <u>Rhodes v. Chapman</u>, 101 S.Ct. 2392, 2399 (1981) (saying that the <u>Estelle</u> decision "rested on the fact, recognized by common law and legislatures, that 'an inmate must rely on prison authorities to treat his medical needs; if the authorities

fail to do so, those needs will not be met"). See also DeShaney, 1074 S.Ct. at 1005.

In each of the cases in this line, the main fact is the fact of continuing incarceration of a sick or injured inmate.[18] And whatever was written in the opinions should be read in the context of the fact of continuing incarceration. "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Cohens v. Virginia, 19 U.S. 264, 399 (6 Wheat. 264) (1821) (Marshall, C.J.).

In none of these earlier cases was the inmate complaining about his total release from confinement. "Release from confinement" is a highly material fact for Count III in this case. So, this case is materially different from every case cited by Plaintiffs or found by us, particularly cases decided before July 1996. Considering the absence of preexisting precedent dealing with the release of sick or injured inmates, we must conclude that a reasonable sheriff, in July 1996, could determine that the fact of his having a policy of releasing sick or injured inmates --

_____

[18]Plaintiffs also point out a number of Eleventh Circuit cases that are part of the same line. Plaintiffs argue these cases clearly established that "intentional interference with prescribed" treatment amounts to a constitutional violation. See Young v. City of Augusta, 59 F.3d 1160, 1169 (11th Cir. 1995); Howell v. Evans, 922 F.2d 712 (11th Cir. 1991), vacated as settled, 931 F.2d 720, reinstated, by unpublished order (11th Cir. June 24, 1991); Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988); Adridge v. Montgomery, 753 F.2d 970, 972 (11th Cir. 1985). But, in each of these cases the facts were materially different from the case now before us: the plaintiffs in these cases were not released and were alleging deprivation of medical care while they remained incarcerated.

39

that is, giving inmates their liberty -- could make all the difference on whether a medical-needs-related violation of the Federal Constitution would arise for the sick or injured inmates.

Not only was the legal landscape, in July 1996, totally barren of cases deciding that giving a sick or injured prisoner his liberty would violate his federal rights,[19] the only case to our knowledge that had earlier discussed the pertinent legal point reached the opposite conclusion. Fewer than two months before the incidents underlying this case, a federal district judge in California had written -- in a reasoned opinion -- that a sick prisoner who was released on parole had no claim for denial of medical care because, "[a]t the time of his parole, plaintiff was not suffering from a 'deprivation of liberty' that precluded him from obtaining medical care; accordingly, plaintiff had no constitutional guarantee of State-provided

---

[19]Plaintiffs cite a case decided in 1998 from the Sixth Circuit concluding that police officers were not entitled to qualified immunity when they released a vagrant whom they had arrested earlier in the evening for public drunkenness. See Davis v. Brady, 143 F.3d 1021, 1027 (6th Cir. 1998). Besides the fact that Davis is not a decision binding in this circuit and was decided close to two years after Owens's release, Davis involved no claim of deliberate indifference to serious medical needs. Furthermore, in Davis, unlike in this case, the Defendants were not the local-government employer or the supervisors of the police: not policymakers sued as such. In Davis, the defendants were the specific police officers who actually released plaintiff (when he was drunk) at a dangerous place. See Id. at 1023.

medical care." <u>Wakefield v. Thompson</u>, No. C 95-0137 FMS (N.D. Cal. Apr. 30, 1996).[20]

The decided cases, preexisting the inmate release underlying this suit, said that the decisive fact which obligated a prison official to provide medical care to a prisoner is the fact of the prisoner's involuntary confinement, confinement that prevented the prisoner from obtaining care from other sources. By releasing a prisoner (for example, at a public place), a sheriff can enable the prisoner to obtain care from other sources (something that eventually happened in this very case). A reasonable Sheriff in 1996 could believe that releasing sick and injured inmates was lawful. The "fact of confinement" in the preexisting cases limited the duty of jailers and -- more important for qualified immunity purposes -- removed the

---

[20]We take seriously the idea of "clearly established." When, around the pertinent time, a district judge is writing that a kind of conduct does not violate the Constitution at all, we need to be particularly careful before concluding that the law was already truly clearly established to be the opposite of the judge's opinion. See <u>Denno</u>, 218 F.3d at 1274; <u>Barts</u>, 865 F.2d at 1193. See also <u>Wilson</u>, 119 S.Ct. at 1701 (2000) (stating that when judges disagree on constitutional question it is unfair to subject officials to money damages for picking wrong side in debate).

By the way, we know that the Ninth Circuit, in 1999, did not agree totally with the district court's view. The appellate court decided that a specific corrections officer did, if the allegations were true, demonstrate deliberate indifference to the inmate's serious medical needs in violation of the Constitution. <u>Wakefield v. Thompson</u>, 177 F.3d 1160, 1165 (9th Cir. 1999). The allegations were that the corrections officer personally handled the pertinent inmate's release and allegedly declined to provide the inmate, at the time of release, with a two-week supply of medications which a prison physician had prescribed and instructed be provided on the inmate's release to the inmate (who, without the medication, would suffer a relapse of his mental disorder, causing violent outbursts). <u>Id.</u> at 1162. The material facts in <u>Wakefield</u> differ from the material facts in this case. And the Ninth Circuit in <u>Wakefield</u> addressed no defense of qualified immunity.

41

power of the preexisting precedents to put sheriffs on fair and clear notice that releasing injured prisoners certainly would constitute deliberate indifference to an inmate's serious medical needs.

It is simply not true that the federal law in July 1996 was already so clearly established to prohibit a policy of releasing sick or injured inmates that reasonable sheriffs would know the policy was unlawful. The Sheriff therefore is entitled to immunity for her policy of releasing sick and injured inmates.[21]

## V. Conclusion

From the complaint's allegations, we conclude that Plaintiffs have sufficiently stated a claim against the County and the Sheriff for the conditions at the Butler County Jail. We also conclude that Plaintiffs have insufficiently alleged that the Sheriff personally is liable for deliberate indifference to Owens's serious medical needs. In addition, we conclude that the Sheriff in her official capacity is

---

[21]We need not reach the question of whether the Sheriff might be entitled to qualified immunity on other, more specific, grounds. For example, preexisting cases had not yet defined, even generally, the point at which some risk of harm becomes -- by virtue of the circumstances surrounding a policy to release sick or injured inmates -- "a substantial risk of serious harm" for the purposes of the law. We need not focus so finely, considering the law was not clearly established at an even higher level of generality, that is, on whether a release from confinement could violate the Federal Constitution at all.

immune from suit. Moreover, we conclude that, if the allegations against the Sheriff are otherwise sufficient to state a claim, the Sheriff in her individual capacity is immune from suit for deliberate indifference to Owens's serious medical needs.

The district court's order is REVERSED, except for the dismissal of all claims against the Sheriff in her official capacity and for the dismissal of the claims against the County and the Sheriff, in her individual capacity, on deliberate indifference to Owens's serious medical needs.

The case is REMANDED for further proceedings on Counts I and II.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part, in which BARKETT, MARCUS and WILSON, Circuit Judges, join:

I concur in the court's judgment reversing the district court's determination that the Sheriff is immune from suit for the injuries Marsh and Owens received as a result of the brutal assaults they suffered at the Butler County Jail.[1] I dissent, however, from the majority's holding that the doctrine of qualified immunity bars the Count III claim for the injuries Owens suffered after Chief Deputy Phillip Hartley released him from the jail and – in total disregard of the hospital's discharge instructions that "the Sheriff's Department follow specific procedures to care for Owens' head wounds and . . . monitor his level of consciousness, pupils, vision, and coordination, and to call the hospital immediately if any change occurred"[2] – abandoned him, shoeless and in bloody clothing, in front of the Thrifty Inn motel on the edge of town, at Exit 128 on Interstate Highway 65.[3] As I read the majority opinion, the Sheriff cannot be held to answer for Owens' injuries because

---

[1]The Jail is located in the City of Greenville, the county seat of Butler County.

[2]See paragraph 53 of the complaint, which is attached to this opinion as an Appendix.

[3]The internet site Mapquest pinpoints the location of the Thrifty Inn at Exit 128 on I-65. Mapquest (visited Sept. 22, 2001 <http://www.mapquest.com>). The Rand McNally Road Atlas shows that I-65 bypasses Greenville, and that Exit 128 is beyond Greenville's city limits. Although these facts are not alleged with such precision in the complaint, the complaint does allege that after Hartley let Owens out of his car at the Thrifty Inn and drove away, the clerks at the Inn refused to give him a room, and when a Waffle House restaurant nearby also provided no help, Owens wandered onto I-65. We should take judicial notice of the location of the City of Greenville, I-65, and the Thrifty Inn, since these facts could not reasonably be disputed.

(1) she had no notice of Owens' release from the jail, (2)  she did not participate in any way in Owens' release and subsequent abandonment, and (3) she cannot be held liable under the doctrine of respondeat superior for Hartley's inexcusable conduct.

After reading the facts alleged in the complaint and drawing all reasonable inferences therefrom, as Rule 12(b)(6) requires, I conclude that the failure of the complaint to allege that the Sheriff actually knew of Owens' medical condition, the discharge instructions the hospital had given Chief Deputy Hartley and Deputy Sheriff Benny Lowery, and Owens' release from the jail and subsequent abandonment at the Thrifty Inn is entirely irrelevant.  What is relevant is how the Sheriff handled inmate assaults – in particular, how she handled those who, like Marsh and Owens, were seriously injured.  I thus turn first to her handling of inmate assaults.

What the facts – alleged and reasonably inferred – show is that the Sheriff did absolutely nothing to prevent inmate assaults at the jail.  As the majority acknowledges, given the jail's configuration and the lack of security, with only one jailor on duty most of the time, assaults were not only inevitable, they were

routine.[4]  In Marsh's case, the inmates who committed the assault were not disciplined (they should have been prosecuted for committing a felony); instead, they were permitted to retain their weapons (they assaulted Owens with the pipe they used to assault Marsh), and they were given a free run on the second floor.[5]  In other words, the inmates had a green light to commit mayhem with impunity.  The majority properly concludes that this constituted the Sheriff's "custom or policy" for dealing with inmate assaults – notwithstanding the fact that the custom or policy had not been reduced to writing, and the complaint does not spell it out as such.  I now turn to the Sheriff's handling of the victims of inmate assaults who received serious injuries.

If the victim was a sentenced prisoner, the inmate, after receiving the necessary medical treatment, would be returned to the jail and would remain there (unless, and until, transported to a state prison facility).  This is what happened in Marsh's case.  He was severely beaten, and then taken to the emergency room at

---

[4]I say that inmate assaults routinely took place because such can be inferred from the multiple complaints lodged against the Sheriff by authorities responsible for overseeing prison and jail conditions in Alabama and the lawsuit pending against her in the United States District Court for the Middle District of Alabama.  The majority properly acknowledges that these complaints, which are described in paragraphs 27 through 29 of the complaint, preceded the assaults against Marsh and Owens.  I also infer that the assaults routinely took place from what the jailors – Sabrena Stone and Preston Nicholson – did, and did not do, once they became aware that the beatings Marsh and Owens sustained in this case were taking place.

[5]See Appendix paragraphs 17, 37, 47.

Stabler Hospital. After being treated in the emergency room, he was returned to the

jail and placed in a holding cell – to separate him from his assailants.[6] If the inmate

happened to be a pretrial detainee – meaning that a court had denied him admission

to bail – the Sheriff would ignore the fact that a judge had ordered him detained[7]

and would release the detainee on his own recognizance.[8] This is what happened in

Owens' case.[9] Owens had been ordered detained,[10] but Chief Deputy Sheriff

Hartley nonetheless released him. The inference, I submit, is inescapable, not

merely permissible – that Hartley, in releasing an inmate who had been ordered

detained, and then abandoning him in front of the Thrifty Inn at 3:30 in the

---

[6]See Appendix paragraph 39.

[7]As noted in the text infra, under Alabama law, a person charged with a misdemeanor is entitled as a matter of right to release on his own recognizance or an appearance bond unless a court orders him detained. Ala. R. Crim. P. 7.2(a).

[8]The majority opinion is silent concerning the lawfulness of the Sheriff's alleged "policy and custom releasing sick or injured inmates." See Appendix paragraph 54. It would be unlawful for the Sheriff to release a sentenced inmate prior to the completion of his sentence or his release on parole. This is why the Sheriff did not release Marsh. On discharge from the hospital, Marsh was taken back to the jail and detained until August 6, 1996, when he was transported to a state correctional institution. See Appendix paragraph 9. It would also be unlawful for the Sheriff to release a pretrial detainee, for to release him would violate the court order requiring the Sheriff to detain him.

[9]See Appendix paragraph 54.

[10]The complaint alleges that Owens occupied the status of a pretrial detainee. See Appendix paragraph 41. We must assume, therefore, as I establish in Subpart A, infra, that a court had denied him admission to bail and ordered his detention (in the Butler County Jail) – until further order of the court.

47

morning, was not acting on his own; instead, he was acting pursuant to the Sheriff's custom or policy – notwithstanding the fact that it had not been reduced to writing and the complaint does not spell it out as such.

This inference is inescapable – that is, a fair minded jury could reasonably draw it – when one focuses, first, on Hartley's, and to a lesser extent Lowery's, conduct from the moment Owens was discharged from the hospital until Hartley abandoned him in front of the Thrifty Inn, and, second, on the facts that led the majority to conclude that the Sheriff was not entitled to qualified immunity from suit for the beatings Marsh and Owens sustained at the jail. Hartley's conduct should not be considered in isolation. Why Hartley did what he did is explained in large part by how the Sheriff ran the jail and, in particular, by what took place there between Marsh's assault on July 1 and Owens' assault two and a half days later.[11]

In Part I, I set forth – from the facts alleged in the complaint and from the permissible inferences they yield – what took place upon and after Owens' discharge from the hospital. From those facts and inferences, I posit, in Subpart A, that one of two things occurred: either Hartley was acting on his own when he released Owens from custody and then abandoned him at the Thrifty Inn, or, as I

---

[11]Marsh's assault took place in the afternoon of July 1, while Jailor Stone, who worked the day shift, was on duty. Owens' assault took place between 11:00 p.m. and midnight on July 3, while Jailor Nicholson was on duty.

48

conclude, he was acting pursuant to the Sheriff's custom or policy. I do so because, as depicted in Subpart B (and in the majority opinion), the events that took place before Owens' discharge from the hospital point inexorably to the proposition that Hartley acted not on his own, but pursuant to the Sheriff's custom or policy.

## A.

Owens was a pretrial detainee, charged with a misdemeanor. Under Alabama law, a person charged with a misdemeanor "as a matter of right may be released pending or during trial on his or her personal recognizance or on an appearance bond unless the court or magistrate determines that such a release will not reasonably assure the defendant's appearance." ALA. R. CRIM. P. 7.2(a). Owens' pretrial detainee status therefore meant that a court or magistrate had denied him release. The circumstances surrounding his incarceration – from the time he entered the jail until Hartley released him in the early morning of July 4 – fully evidences the fact that Owens had been ordered detained. Had he been granted release on his own recognizance, Owens would have signed his bond on July 1 and walked out of the jail. He would have done so because he feared for his safety. On July 2 or 3, after having been harassed by other inmates, he asked Jailor Stone to put him in a solitary cell. She refused his request.[12] Moreover, had he

---

[12]See Appendix paragraph 45.

49

been entitled to leave on his own recognizance, his uncle, who came to the jail with his medicine on July 2 (after his grandmother had spoken to the jailor on duty), would have obtained his release.[13]  Thus, as of the time he suffered the assault – between 11:00 p.m. and midnight on July 3 – and as of the time of his release – at 3:30 a.m. on July 4 – Owens' status as a pretrial detainee had not been altered. Chief Deputy Hartley obviously knew this; that is why he rushed Owens to "sign his own bond" less than twenty minutes after his discharge from the hospital. Hartley was in such a hurry to get Owens out of the jail and out of town that he did not pause to retrieve Owens' shoes or find something for him to wear.[14]  I return to that point later.

Hartley came to the jail while Owens was being assaulted or shortly thereafter;[15] he was the only person in the Sheriff's office to accept Nicholson's plea for help.  Nicholson, on duty alone at the jail, "called the Greenville City Police.  Two city police officers arrived, but refused to go upstairs.  Nicholson then

---

[13]See Appendix paragraph 43.

[14]I realize that the complaint did not allege this in the manner I have set out.  I am convinced, however, that a competent lawyer would be entitled to argue the point to a jury notwithstanding the Sheriff's objection.

[15] The complaint does not fix the precise moment of his arrival at the jail.  It had to be, however, before an ambulance came to transport Owens to the hospital at 12:17 a.m. on July 4.

called Sheriff Harris and Jail Administrator Thelma Teague. Both refused to come

to the jail."[16]  When the county's chief law enforcement officer refused to become

involved, Nicholson turned to Chief Deputy Hartley.[17]

The brutal assault on Owens by four inmates – the same four who assaulted

Marsh on July 1 – began sometime between 11p.m. and midnight on July 3 and

lasted between thirty to sixty minutes.[18]  It was, under Alabama law, an assault in

the first degree,[19] if not attempted murder.[20]  The assailants suspended the assault

---

[16] See Appendix paragraph 49.

[17]  The inferences here are either (1) that Nicholson called Hartley pursuant to the Sheriff's instructions or (2) that the Sheriff gave Nicholson no instructions, so he called Hartley on his own initiative.  The first inference supports the ultimate inference that Hartley was acting pursuant to the Sheriff's custom or policy.  However, not until the plaintiff is able to interrogate Nicholson and the Sheriff under oath will the truth be known.  Under the majority's approach to the problem, plaintiff's counsel should have alleged the first inference as a fact.  In that plaintiff's adversary has possession of all of the evidence on the point, how counsel could make such an allegation without violating Rule 11 of the Federal Rules of Civil Procedure escapes me.

[18] See Appendix paragraphs 49, 50.

[19]  ALA. CODE § 13A-6-20 (2001) defines assault in the first degree as:
　　　　(a) A person commits the crime of assault in the first
　　　　degree if:
　　　　(1) with intent to cause serious physical injury to another
　　　　person, he causes serious physical injury to any person
　　　　by means of a deadly weapon or a dangerous instrument;
　　　　or
　　　　. . .
　　　　(3) under circumstances manifesting extreme indifference
　　　　to the value of human life, he recklessly engages in
　　　　conduct which creates a grave risk of death to another
　　　　person, and thereby causes serious physical injury to any

51

on several occasions upon hearing the rustling of keys but continued to beat Owens "[w]hen they realized that no one was coming upstairs."[21] Twenty minutes after the incident, Hartley retrieved Owens, who "lay in a pool of blood on the dayroom floor."[22] Owens' injuries were serious and an ambulance was called to the scene; at 12:17 a.m., it transported Owens to Stabler Hospital.[23] He was received in the emergency room and treated there for nearly three hours, until 3:10 a.m., when Chief Deputy Hartley and Deputy Lowery regained his custody. To obtain Owens' custody, they had to sign a discharge sheet which stated that Owens was being

---

      person.

[20] Under ALA. CODE § 13A-6-2 (2001), a person commits murder if:
      (1) With intent to cause the death of another person, he
      causes the death of that person or of another person . . . .
ALA. CODE § 13A-4-2 (2001) defines attempt as follows:
      (a) a person is guilty of an attempt to commit a crime if,
      with the intent to commit a specific offense, he does any
      overt act towards the commission of such offense.
      . . .
      (d) An attempt is a:
      (1) Class A felony if the offense attempted is murder.

At one point during the assault on Owens, an inmate called Jailor Nicholson for help, yelling "they're killing him up here." See Appendix paragraph 48.

[21] See Appendix paragraph 50.

[22] See Appendix paragraphs 51, 52.

[23] See Appendix paragraph 52.

discharged into the custody of the "Sheriff's Department" with instructions "to follow specific procedures to care for Owens' head wounds and other injuries[,] . . . to monitor his level of consciousness, pupils, vision, and coordination, and to call the hospital immediately if any change occurred."[24] A fair-minded jury would readily infer from the allegation that the two deputies "signed a discharge sheet" that they had read and understood the instructions it contained. The jury would also infer the deputies, in signing the discharge sheet, the deputies represented, and the emergency room physician assumed, that Owens would remain in the custody of the Sheriff's Department.[25]

This representation was false, and it was false when made. Chief Deputy Hartley never intended to have Owens monitored by the Sheriff's Department – at the Butler County Jail or any other facility. Why? Because moments after he and Lowery arrived back at the jail, he instructed Owens "to sign his own bond,"[26] and then took him to the edge of town, let him out at the Thrifty Inn and drove away.[27]

---

[24] See Appendix paragraph 53.

[25] Can it be doubted that the discharge instructions were written by a physician? Since Owens was not admitted to the hospital proper, the physician had to be the doctor on duty in the emergency room.

[26] See Appendix paragraph 54.

[27] Hartley did not even wait to see whether the Thrifty Inn would give Owens a room. We know this because, after denying Owens a room, someone at the motel called the Greenville

All of this – from Owens' discharge from the hospital to the arrival at the motel – took no more than twenty minutes. How anxious was Hartley to get rid of Owens? He was so anxious that he did not so much as bother to retrieve Owens' shoes or get him a change of clothing; he took Owens to the Thrifty Inn in the same horrible condition in which he found Owens after the assault, and did not wait to see whether he could get a room there. He simply let Owens out of the car and drove off. What does Hartley's conduct imply? The possible inferences are (1) that he committed this reprehensible conduct entirely on his own, or (2) that he was acting pursuant to the Sheriff's custom or policy or explicit directions.[28]

If Hartley acted on his own, then he chose to lie to the emergency room physician who told him and Lowery that he would not discharge Owens unless the Sheriff's office would agree to monitor his condition and to call the hospital if he

_____

Police. See Appendix paragraph 55. By this time, Owens was out in the night fending for himself.

[28]Another inference is that Hartley thought that having Owens sign "his own bond" relieved him, and the Sheriff, of the obligation to care for Owens' serious medical needs in accordance with the hospital's discharge instructions. In other words, he could vitiate the instructions, and his (and Lowery's) representation – in signing the discharge sheet and by releasing Owens on his own recognizance. Attempting to avoid his, and the Sheriff's, obligation to monitor Owens' condition and report any untoward changes to the hospital would, in my view, be disingenuous. I doubt that a jury would infer that Hartley conjured such a scheme of avoidance between 3:10 and 3:30 in the morning, and therefore reject the scheme as a permissible inference from the facts alleged in the complaint.

took a turn for the worse.  There can be no doubt that he lied to the emergency room physician because the moment he arrived back at the jail, after having Owens sign his bond, he turned around and headed out of town, letting Owens out at the Thrifty Inn.  Hartley not only lied to the physician, but he ignored the fact that a court had ordered Owens detained.  Why would the Sheriff's Chief Deputy do such things?  What incentive would he have to lie to the emergency room doctor,[29] to disregard a court order, and, perhaps worst of all, to treat a human being as cruelly as he treated Owens?  If the Greenville Police had not found Owens staggering on the I-65 overpass, he could have been hit by a car and killed.  A fair minded jury would find that Hartley did such things – as utterly reprehensible and contemptuous as they were – to keep his job.  Under no circumstances would he do such things on his own.  If he did, the Sheriff would fire him.  Her explanation to the judge who had ordered Owens detained would be that she had nothing to do with Hartley's

---

[29]I would dare say that, if his deposition is taken in this case, which will surely be done, the emergency room physician – in describing the seriousness of Owens' injuries – will certainly emphasize the importance of the discharge instructions he gave Hartley and Lowery and relate in full the conversation he had with these officers before he allowed them to take Owens away.  One does not have to be clairvoyant to picture what the doctor will say when asked – by the Sheriff's lawyers – whether Owens was in any condition to be taken out of town and left at the front door of a motel along I-65 to fend for himself.  Armed with the majority opinion, which grants the Sheriff qualified immunity for Hartley's conduct, the Sheriff's lawyers will no doubt object that the examination of the emergency room physician I posit would be improper.  Their objection should be ruled out of order; the examination I posit will constitute evidence concerning the extent of the injuries Owens received at the jail.

disregard of his detention order, and that he had been fired.  In addition to losing his job, Hartley would leave himself wide open for a suit for damages.  No, Hartley was following the Sheriff's custom or policy.[30]  If there is any doubt, the events that took place before Hartley came on the scene should remove it.

B.

The majority properly acknowledges the deplorable conditions at Butler County Jail countenanced by Sheriff Harris.  Her actions, or lack thereof, were so egregious that every judge of this en banc court has voted to deny the Sheriff immunity from suit despite the absence of a Supreme Court or Eleventh Circuit case on all fours that would have placed her on notice that her operation of the jail – top to bottom – constituted cruel and unusual punishment within the meaning of the Eighth and Fourteenth Amendments.  No such notice is required where it would be obvious to anyone standing in the Sheriff's shoes that her operation of the jail

---

[30]I posit that, during the pretrial discovery that ensues once this case is returned to the district court – especially the depositions of the Sheriff, Hartley, and those who operate Stabler Hospital – plaintiff's counsel will determine who would have been responsible for paying the bill if Owens had been admitted to the hospital.   If the Sheriff would have been responsible, perhaps this might explain why Hartley and Lowery were willing to sign the discharge sheet and why Hartley abandoned Owens at the Thrifty Inn.  In other words, the Sheriff's standing orders were to avoid having an assaulted inmate admitted to the hospital.  In Owens' case, implicit in the monitoring instructions the emergency room physician gave the deputies is the fact that, had they told the doctor that the Sheriff's office was not going to obey the instructions, Owens would not have been permitted to leave the hospital.

trampled upon the constitutional rights of sentenced inmates and pretrial detainees.[31]

The building was in such a state of disrepair that inmates were able to fashion makeshift weapons by cannibalizing parts of the decaying building. The locks on the cell doors did not function, and as a result, inmates were not kept in distinct berths, but instead were free to roam with no classification to divide pretrial detainees from convicted felons or violent offenders from nonviolent ones. Instead of making up for structural deficiencies with increased monitoring, the Sheriff allowed the facility to remain grossly understaffed and technologically deficient. The inmate population was often controlled by a single jailor who was also responsible for intake and release, monitoring the perimeter, as well as administrative tasks such as coordinating mail, food service, medication, and phones.

That aggravated assaults by inmates had become acceptable is further evidenced by the conduct of the jailor in charge during the Marsh and Owens assaults. From the complaint, we can glean that one jailor worked the day shift and one manned the night shift at the Butler County Jail. Sabrena Stone was on duty

---

[31]While no on-all-fours-case from the Supreme Court or this court put the Sheriff on notice, she nonetheless had plenty of notice from other quarters, not the least of which was a lawsuit pending in the United States District Court for the Middle District of Alabama. See supra note 4.

during the attack on Marsh; Nicholson was on duty during the assault on Owens. On each occasion the jailor – Stone on July 1, and Nicholson on July 3 – waited until the attack was over to rescue the victim despite loud calls (from the victim and other inmates) for help. When attackers realized that no help for their victim was coming, they returned to the dayroom to continue the assault. The assailants could confidently continue their crimes knowing that they would not face legal punishment or any negative consequence within the jail. Neither Stone nor Nicholson took any steps to bring the assailants to justice or to deter future occurrences of violence, nor did Investigator Harden, who took Marsh to the hospital, or Hartley or Lowery, who ministered to Owens. Indeed, the assailants had a "green light." The inferences that can be drawn from all of this are, first, that the Sheriff was not going to charge any assailant, and, second, that her subordinates were aware of her policy and therefore acted accordingly.

In sum, I submit that when one considers Chief Deputy Hartley's conduct after he surreptitiously obtained Owens' release from the Stabler Hospital in the light of what transpired at the jail beforehand, the inference is inescapable that Hartley acted at the Sheriff's behest. Lancaster v. Monroe County, 116 F.3d 1419, 1429 (11th Cir. 1997), a case the majority opinion fails to cite, is directly on point. There we observed that under Alabama law, "deputies are a legal extension of the

58

sheriff because they act as sheriff's agent and can perform any act within [the] sheriff's authority." (citing Carr v. City of Florence, 916 F.2d 1521, 1526 (11th Cir. 1990)). How can it be argued that Chief Deputy Sheriff Hartley was not the Sheriff's agent?

## II.

The proper use of Rule 12(b)(6) of the Federal Rules of Civil Procedure is at stake in this case. The majority shows abject disregard for the Rule's command requiring us to accept all alleged facts as true and then draw from those facts as many inferences favorable to the plaintiff as possible. Instead, the majority turns a blind eye to context and considers each fact in isolation, in effect destroying any chance for a properly pled (circumstantial evidence) claim to survive a motion to dismiss.

The traditional strategy for defeating a circumstantial evidence case – on the pleadings, or on summary judgment, or at trial – is to isolate the facts alleged, or proven, and then say: what does this prove? Of course, it may prove nothing. Defense counsel in conspiracy prosecutions routinely make this argument to the jury; they point to isolated acts, which are entirely innocent on their face – like making a telephone call, or walking across the street – and say that they establish nothing. The prosecutor, in responding, treats these innocent acts as dots and draws

lines between the dots. What emerges is the criminal conspiracy charged in the indictment. The majority opinion uses the former tactic here. For example, referring to the Sheriff's "custom and policy of releasing sick or injured inmates," alleged as a fact in paragraph 54 of the complaint, the majority, isolates the fact and observes: "We believe such a policy, on its face, violates no constitutional guarantees and is not a facially unconstitutional policy." Ante at 34. I am at a loss to understand such treatment of this fact. Owens does not seek an order enjoining this policy as unconstitutional. Rather, the allegation merely asserts why Hartley had Owens sign his own bond. In addition to isolating facts revealed by the complaint, so to neutralize them, the majority, although paying lip service to the need to consider the inferences these facts yield, says that "no inferences can be reasonably drawn to make up for the missing facts." Ante at 36. I invite the majority to say that the inferences I have drawn from the facts "well pled" in Owens' complaint are not there.

The majority opinion, if implemented, will invite lawyers with cases like Owens' – in which they have no access to the evidence that would explain why the Sheriff and her deputies acted as they did – to allege facts in the blind. What about Rule 11 of the Federal Rules of Civil Procedure? The majority opinion makes no mention of the rule, but it is surely implicated. Rule 11 states, in pertinent part:

60

**(b) Representations to Court.** By presenting to the court . . . a [complaint] . . . an attorney . . . is certifying that to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the [complaint's] claims . . . and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions [of the complaint] have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

**(c) Sanctions.** If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

FED. R. CIV. P. 11 (2001).

Let us suppose that, when this case returns to the district court, Owens' counsel examines the Sheriff, Chief Deputy Hartley, the emergency room physician (who treated Owens), and the hospital's administrator on deposition, and the following is established:

1) The injuries Owens sustained during the assault were serious enough that he needed close monitoring, because he might suffer a relapse.

61

2) After Owens arrived at the emergency room, at around 12:17 a.m., Hartley called the doctor on duty. The doctor told him that his injuries were serious and that he need to be watched closely because his condition might worsen. The doctor told Hartley that he should be hospitalized so his condition could be monitored; Hartley responded that the monitoring could be done at the jail. Hartley said this because, after the ambulance transported Owens to the hospital, Hartley, knowing that Owens had serious injuries, called the Sheriff. They discussed the possibility that the emergency room doctor might want Owens admitted to the hospital proper, and that, if admitted, the Sheriff would have to pay the bill. The Sheriff did not want to pay the bill; she was terribly short of funds – which explained why she had been unable to correct the multiple deficiencies the state corrections officials and others had cited. So, the Sheriff instructed Hartley do what was necessary to keep Owens out of the hospital. He had to lie to the emergency room doctor, if necessary.

3) Hartley lied to the doctor; he misrepresented that Owens would be monitored at the jail in accordance with the hospital's, and the doctors', discharge instructions.

4) At some point, Hartley and the Sheriff discussed Owens' disposition after he and Lowery retrieved him from the hospital. They recalled what had happened to Marsh after he returned to the jail; the four inmates who had assaulted him got into his holding cell and blasted him with a fire extinguisher. The same four inmates were the ones who had assaulted Owens, and were still "at large," and in possession of their weapons. If Owens were readmitted to the jail, they knew – given his condition – that he could not withstand another assault. The Sheriff's and Hartley's discussion ended with the Sheriff's instruction that Hartley get Owens out of the jail and take him to a motel on the edge of town. They overlooked the fact that Owens was a pretrial detainee and, as such, could not be released except on court order.

If Count III had alleged these facts, I have no doubt that the majority would hold that the Sheriff is not entitled to qualified immunity. As I read the majority's position, the drafter of Count III should have alleged these facts or their equivalent.

62

In my view, the ethical constraints imposed on the litigation bar by Rule 11 precluded him from doing so. This is a quintessential Catch-22 situation, is it not?

Now, continuing the above supposition, after obtaining this evidence – which, with perhaps the exception of what the emergency room doctor might say – was, and is, entirely in the possession of the Sheriff, her Chief Deputy, and their minions, Owens' counsel moves the district court to amend Count III. The Sheriff, citing the law of the case doctrine, will object and her objection will probably be sustained. Or she will plead the statute of limitations. In either case, Owens, who had no access to the evidence which would establish the facts the majority says he should have pled, will go hence without day.

Respectfully, I dissent.

BARKETT, Circuit Judge, concurring in part and dissenting in part, in which TJOFLAT, MARCUS and WILSON, Circuit Judges, join:

I concur with the majority's ultimate resolution of the claims against Sheriff Harris in her official capacity, the claims against Butler County, and Marsh and Owens's deliberate indifference to serious risk of harm claims against the Sheriff in her individual capacity. I dissent, however, from the majority's dismissal of Owens's claim of deliberate indifference to his serious medical needs against the Sheriff in her individual capacity. I believe that the allegations in the complaint, taken as true and viewed in the light most favorable to Owens, are sufficient to withstand a motion to dismiss for failure to state this claim. Moreover, I believe that the law of deliberate indifference was sufficiently clear at the time of the incident that any reasonable government actor would have known that the alleged indiscriminate policy of releasing sick and injured inmates without guidelines that would have prevented the officers from abandoning Owens in his condition at 3:00 a.m. on the side of the road was unconstitutionally applied to Owens.

Federal Rule of Civil Procedure 8(a) requires that the plaintiff's complaint contain only, "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends, . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the

64

pleader seeks . . . ." In <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), the Supreme Court explained that Rule 8 "means what it says" in that the Rule does not "require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Id.</u> at 47. Consistent with this standard and cognizant of a plaintiff's limited ability to develop facts early in the litigation process, the Supreme Court held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Id.</u> at 45-46; <u>see also</u> <u>Harper v. Blockbuster Entertainment Corp.</u>, 139 F.3d 1385, 1387 (11th Cir. 1998). Here, the complaint's allegations, viewed in light of this standard, are sufficient to withstand the Sheriff's motion to dismiss.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976)). In order to state such a claim against Sheriff Harris, Owens must allege that (1) he suffered from a serious medical need, (2) Sheriff Harris was deliberately indifferent to that need, and (3) Harris's deliberate

indifference caused him to suffer harm.  See McElligot v. Foley, 182 F.3d 1248, 1254-55 (11th Cir. 1999).  Moreover, deliberate indifference encompasses not only the failure to provide attention to an inmate's medical needs, but also intentionally interfering with the inmate's ability to receive prescribed health care.  See Estelle, 429 U.S. at 105;  Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) ("Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment . . . .") (quoting Ramos v. Lam, 639 F.2d 559, 575 (10th Cir. 1980)); see also Wakefield v. Thompson, 177 F.3d 1160, 1164 (9th Cir. 1999) (holding that prison's duty to provide medical care extends to period after release sufficient to allow former inmate to consult doctor and obtain new supply of medication).  This is especially true where, as here, the plaintiff's injury is the result of the official's own malfeasance and the release is at a time and place where the plaintiff stood little chance of receiving a prescribed treatment.  This is not to say that the release of an inmate with a serious medical need always violates the Constitution.  A jailer is not constitutionally required to provide for the continued medical care of a released inmate.  The Constitution does require, however, that the release itself not be an act of deliberate indifference – i.e. that the release, or manner of release, is not an unreasonable response to a known medical need.  Therefore, where, as here, the

66

serious medical need is known by the officials, is created by the official's conduct, and the inmate is released in an unreasonable manner where he has little or no chance of obtaining his prescribed treatment, there is the deprivation of a constitutional right.

Taking the allegations in the complaint as true, it cannot be gainsaid that the condition Owens alleged he was in when he was released by the hospital constituted a "serious medical need" and that the officers who took him from the hospital knew of his need.  Owens's head, neck and face were severely swollen and bruised, his lip had a hole torn through it, his ribs and chest were bruised and had been diagnosed as requiring continuing care and monitoring for his head injuries.  The complaint alleged that the officers signed a release form acknowledging the need for the prescribed care.  See Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (defining a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").  Likewise, there can be no serious dispute that Owens sufficiently pled that the officers' decision to ignore the instructions given to them at the hospital, and to instead abandon him barefoot, wearing bloodied clothing, severely swollen and bruised at

3:00 a.m. with little or no chance of securing his prescribed care, caused him to suffer harm.

Thus, in his claim against the Sheriff, the only question is whether Owens sufficiently alleged facts supporting the reasonable inference that the Sheriff was deliberately indifferent to his serious medical needs. The majority holds that Owens has not satisfied this requirement because he has not alleged that the Sheriff is "causally linked" to his constitutional deprivation. See, e.g., Rizzo v. Goode, 423 U.S. 362 (1976). Viewing the allegations in the complaint in the light most favorable to Owens, however, I believe that the complaint is sufficient to withstand the Sheriff's motion to dismiss.

As our case law recognizes, there are several ways Owens can establish the required causal link. Although § 1983 requires a connection between the official's acts or omissions and the plaintiff's injury, "[p]ersonal participation is only one of several ways to establish the requisite causal connection. . . . An official may also be liable where a policy or custom that [she] established or utilized results in deliberate indifference to an inmate's constitutional rights." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (internal citations omitted); see Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11th Cir. 1995) ("'[L]iability may be imposed due

to the existence of an improper policy or <u>from the absence of a policy</u>.'") (emphasis added) (quoting <u>Rivas v. Freeman</u>, 940 F.2d 1491, 1495 (11th Cir. 1991)).

Owens alleged that the officers acted with deliberate indifference to his serious medical needs pursuant to a policy and custom of indiscriminately releasing sick and injured inmates. Owens also alleged that the Sheriff was responsible for the development and implementation of any policy at the Jail pertaining to treatment of sick and injured inmates. The complaint further alleged that the Sheriff received a call from the Jail during the assault on Owens. Rather than crediting these allegations and viewing them in the light most favorable to Owens, the majority refuses to infer any content into the phone conversation and simply refuses to accept the allegation of the Sheriff's obligations regarding the development and implementation of a reasonable medical policy.

As to the phone call, the majority states, "Nothing alleges that the Sheriff was aware of who was being assaulted, the severity of the assault, or that an inmate would have to go to the hospital." Majority at *31 n. 15. However viewing the allegations regarding the phone call in the light most favorable to Owens, the phone conversation contained all of the relevant information. Although the Sheriff may not have known Owens's name, the reasonable inference drawn from a phone call made during a serious assault at the jail in which inmates were screaming "They're

69

killing him up here," to the Sheriff's home, in the middle of the night, by the only deputy on duty at the Jail, after the local police had refused to help break up the assault, is that the call was made to inform the Sheriff of the situation and to ask for her advice and help. Thus, it is reasonable to infer that the Sheriff was fully informed of the assault on Owens when she refused to come to the Jail, and it does not "appear beyond doubt" that Owens would be unable to prove these facts given the opportunity to conduct discovery.

Further, the majority's refusal to credit Owens's allegation regarding the development and implementation of the policy in effect at the Jail flies in the face of the bedrock jurisprudential principle that when ruling on a motion to dismiss the plaintiff's allegations must be taken as true. See, e.g., Hughes v. Rowe, 449 U.S. 5 (1980); Cruz v. Beto, 405 U.S. 319 (1972); Womack v. Runyon, 147 F.3d 1298 (11th Cir. 1998). The majority rejects Owens's allegation regarding the existence of a policy stating that unsupported conclusions of law will not prevent a Rule 12(b)(6) dismissal. The existence and content of a policy, or the lack thereof, however, is a factual, not a legal, allegation. Moreover, the Supreme Court has held that in reviewing a complaint alleging the existence of a custom or policy, the plaintiff's allegations are to be taken as true and no particularized allegations are

required to survive a motion to dismiss.[1]  See Leatherman v. Tarrant County

Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 167-68 (1993).

Accordingly, I believe Owens alleged sufficient facts to support a reasonable

inference that the Sheriff was aware that Owens was being seriously assaulted and

that she was aware that Owens would be released from custody – regardless of his

condition – pursuant to the policy she developed.  I agree with the majority that the

policy is facially constitutional because it could be humanely applied.  However,

contrary to the majority, I believe that, in light of the circumstances that existed at

the Jail, the policy posed an obvious danger to inmates such that an allegation

---

[1]Under Supreme Court precedent and the Federal Rules of Civil Procedure, a court ruling on a motion to dismiss is required to accept a plaintiff's allegations as true and construe those allegations in the light most favorable to the plaintiff.  In failing to do so here, the majority conflates the degree of specificity required of a complaint to adequately allege a substantive fact and the actual substantive facts which must be alleged to state a claim.  To the extent that the majority suggests a different standard for pleading in anticipation of the affirmative defense of qualified immunity, the Supreme Court has held that "questions regarding pleading . . . are most frequently and most effectively resolved either by the rulemaking process or the legislative process."  Crawford-El v. Britton, 523 U.S. 574, 595 (1998) (rejecting attempt to impose heightened standard of proof on civil rights claims as unsupported by § 1983 and the Federal Rules and straying "far from the traditional limits on judicial authority").  Here, although the majority implies that the policy concerns behind qualified immunity justify requiring more particular allegations from Owens's complaint, " that is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."  Leatherman, 507 U.S. at 168 ("it is impossible to square . . . [a] heightened pleading standard . . . with the liberal system of 'notice pleading' set up by the Federal Rules").  Indeed, when Congress has wished to impose a heightened pleading standard, it has not hesitated to do so, either in the Federal Rules of Civil Procedure, see Fed. R. Civ. P. 9(a) (imposing heightened pleading standard for allegations of fraud and mistake), or by statute, see 15 U.S.C. § 78u-4 et seq. (imposing heightened pleading standard for claims under federal securities laws).

regarding the existence of the policy leads to the reasonable inference that the Sheriff was aware that the policy posed an excessive risk of harm. Here, the Sheriff ran a jail that was in such poor condition, so understaffed, and so poorly managed that the facility itself posed an excessive risk of harm to inmates of which the Sheriff was aware. In such a circumstance, it is inevitable that inmates will be seriously injured, as Owens was here. A policy of releasing sick and injured inmates – regardless of the degree of injury – clearly poses an excessive risk of harm to those inmates and it is reasonable to infer that the Sheriff knew of this risk. I believe that these facts are sufficient to support a finding of deliberate indifference.

I also believe that the law was sufficiently clear at the time of the challenged action that qualified immunity does not bar civil liability for this claim. Under the doctrine of qualified immunity, government officials sued for damages for injuries arising out the performance of their discretionary functions must be "shown to have violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Conn v. Gabbert, 526 U.S. 286, 290 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As the Supreme Court has explained, "qualified immunity seeks to ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability,' by attaching liability only

if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" United States v. Lanier, 520 U.S. 259, 270 (1997) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Saucier v. Katz, ___ U.S. ___, 121 S. Ct. 2151, 2156 (2001). Thus, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.

By July 4, 1996, the date of the alleged incident, preexisting law clearly established that Owens was entitled to the medical treatment that the doctors at Stabler Hospital had prescribed for his injuries. The Supreme Court held in 1976 that deliberate indifference is shown not only by failing to provide prompt attention to an inmate's medical needs, but also by "intentionally interfering with treatment once prescribed." Estelle, 429 U.S. at 105; see also Ancata, 769 F.2d at 704.

The Eleventh Circuit has applied this principle of "intentional interference with prescribed treatment" on numerous occasions. See, e.g., Young v. City of Augusta, 59 F.3d 1160, 1169 (11th Cir. 1995) (denying summary judgment where the evidence indicated that jail officials failed to dispense "the psychotropic drugs prescribed for her . . . as directed"); Howell v. Evans, 922 F.2d 712 (11th Cir.), vacated as settled, 931 F.2d 711, 720 (11th Cir.), reinstated by unpublished order (11th Cir. June 24, 1991) ("the law was clearly established at the time of Howell's death that if a reasonable official would have known that certain treatment was necessary, the refusal to provide or a delay in providing that treatment would constitute deliberate indifference and violate Howell's Eighth Amendment rights"); Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988) (finding that unavailability of prescribed medication and failure of officials to follow hospital instructions for treating inmate were material to determination of officials' deliberate indifference); Aldridge v. Montgomery, 753 F.2d 970, 972 (11th Cir. 1985) (reversing directed verdict for county officials who had failed to give an inmate, having just received stitches for a cut above his eye, "ice packs and aspirin prescribed by the doctor for pain upon his return to the jail").

Owens alleged that he suffered from "serious medical needs" after being released from the hospital following his assault at the Jail. He claimed that the

hospital staff "instructed the Sheriff's Department to follow specific procedures to care for his head wounds and other injuries. It instructed them to monitor his level of consciousness, pupils, vision, and coordination, and to call the hospital immediately if any change occurred." His condition was diagnosed by a physician as mandating treatment and monitoring, and he was in a great deal of pain.

Had Owens been left in the hospital or otherwise been released in a manner that afforded him access to his prescribed medical treatment, such as with a family member or other responsible person, this would be a different case. However, the complaint alleges that rather than adhering to the written instructions they received when signing Owens out of the hospital, the officers released Owens, instructing him to sign his own bond, and dropped him off near an interstate outside of a motel at 3:00 a.m. Owens was barefoot, wearing bloodied clothing, and was severely swollen and bruised. When he stepped out of the officer's car, the officer drove away. Owens was, understandably, unable to secure a room at that motel, and, after walking dazedly across the highway, he was also denied entrance to a restaurant. At that point, a city police officer picked him up and ordered a clerk at a Holiday Inn to rent a room to Owens. These allegations fit within the preexisting deliberate indifference case law outlined above and, therefore, Harris is not entitled to qualified immunity at this stage in the proceedings.

Accordingly, I believe that the original panel opinion reached the correct result and should be reinstated.